

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
### FORT WORTH

## NO. 02-12-00172-CR

STEVE ROBERT PATTERSON                                                       APPELLANT

V.

THE STATE OF TEXAS                                                               STATE

----------

## FROM THE 235TH DISTRICT COURT OF COOKE COUNTY
## TRIAL COURT NO. 10-00267

----------

## **OPINION**[1]

----------

[1]This case was originally submitted without oral argument on April 23, 2013, before a panel consisting of Justice Gardner, Justice Walker, and Justice McCoy. The court, on its own motion on February 26, 2015, ordered this case reset without oral argument on March 17, 2015; assigned this case to a new panel, consisting of Justice Walker, Justice Gabriel, and Justice Sudderth; and assigned the undersigned to author the opinion.

## I. INTRODUCTION

Appellant Steve Robert Patterson entered an open plea of guilty to the offense of intoxication manslaughter. *See* Tex. Penal Code Ann. § 49.08 (West 2011). The criminal charge arose from a car accident that occurred when a Corvette driven by Patterson left the road and hit a tree; Patterson's brother, who was a passenger in the Corvette, died at the scene. Patterson elected to have a jury assess his punishment. *See* Tex. Code Crim. Proc. Ann. art. 26.14 (West 2009). Following a three-day punishment hearing, the jury returned a verdict assessing Patterson's punishment at the maximum of twenty years' confinement and a fine of $10,000.[2] *See* Tex. Penal Code Ann. §§ 12.33, 49.08 (West 2011). The two issues we address in this appeal involve whether Patterson is entitled to a new punishment hearing because the trial court admitted the testimony of Texas Department of Public Safety Trooper Samuel Hellinger and of Cooke County Sherriff Michael Compton that Patterson was not a suitable candidate for probation.[3] These opinions were admitted over Patterson's objections that neither of the witnesses was qualified to offer such an opinion. Because the trial

---

[2]The punishment assessed by the jury exceeded the fifteen years' confinement recommended by the State and also precluded any possibility of probation, which was sought by Patterson. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 4(d)(1) (West Supp. 2014) (stating that a defendant is not eligible for probation if the defendant is sentenced to more than ten years' imprisonment).

[3]We recognize that "probation" is now referred to as "community supervision." *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 2(2) (West Supp. 2014). We nonetheless use the term probation because that is the term utilized by the State, by Patterson, and by the witnesses.

court erred by admitting this testimony and because, based on our examination of the record as a whole, we do not have "fair assurance" that the error did not influence the jury or had but a slight effect, we will reverse the trial court's judgment imposing sentence on Patterson and remand this case for a new punishment hearing. We note at the outset that the State did not file a brief in this appeal.

## II. ANALYSIS OF ERROR

## A. Standard of Review

The standard of review for a trial court's determination of a witness's qualifications to render an opinion (lay or expert) is abuse of discretion. *Rodgers v. State*, 205 S.W.3d 525, 533 (Tex. Crim. App. 2006). We will not substitute our judgment for that of the trial court but rather will determine whether the trial court has made a decision that is outside the zone of reasonable disagreement. *Tillman v. State*, 354 S.W.3d 425, 442 (Tex. Crim. App. 2011). We review the ruling in light of what was before the trial court at the time the ruling was made. *Rodgers*, 205 S.W.3d at 528–29.

In determining the admissibility of expert testimony, Texas Rule of Evidence 702 imposes a special gatekeeping function on the trial court and requires that a trial judge make three separate inquiries: whether "(1) the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education; (2) the subject matter of the testimony is an appropriate one for expert testimony; and (3) admitting the expert testimony will actually assist the fact-

3

finder in deciding the case." Tex. R. Evid. 702; *Vela v. State*, 209 S.W.3d 128, 131 (Tex. Crim. App. 2006); *Henderson v. State*, 77 S.W.3d 321, 323 (Tex. App.—Fort Worth 2002, no pet.). Because the spectrum of education, skill, and training is wide, a trial court has great discretion in determining whether a witness possesses appropriate qualifications to assist the jury as an expert on a specific topic in a particular case. *Davis v. State*, 329 S.W.3d 798, 813 (Tex. Crim. App. 2010), *cert. denied*, 132 S. Ct. 128 (2011).

Conversely, a lay witness may testify pursuant to the terms of Texas Rule of Evidence 701 to opinions or inferences that are "(a) rationally based on the witness's perception and (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue." Tex. R. Evid. 701; *see Ellison v. State*, 201 S.W.3d 714, 723 (Tex. Crim. App. 2006) (setting forth standard for admissibility of both expert- and lay-opinion testimony under rules 701 and 702). However, under rule 602, entitled "Need for Personal Knowledge," a lay witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter. Tex. R. Evid. 602. The "perception" requirement of rule 701 incorporates the "personal knowledge" requirement of rule 602. *Osbourn v. State*, 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

And finally, a particular witness may be qualified to give testimony both under rule 702—because of his or her superior experiential capacity—and under rule 701, if the witness's testimony and opinion are based upon firsthand

4

knowledge. *Ellison*, 201 S.W.3d at 723; *Osbourn*, 92 S.W.3d at 535. When a witness who is capable of being qualified as an expert testifies regarding events that he or she personally perceived, the evidence may be admissible as both rule 701 opinion testimony and rule 702 expert testimony. *Ellison*, 201 S.W.3d at 723.

## B. The Law Governing Admission of Opinion Evidence at Punishment that a Defendant Is Not a Suitable Candidate for Probation

Generally, evidence offered by either the defendant or the State regarding suitability of the defendant for probation at the sentencing phase of a trial is a matter "relevant to sentencing" under article 37.07, section 3(a) of the code of criminal procedure when the defendant seeks probation. *Id.* at 722–23 (citing Tex. Code Crim. Proc. Ann. art. 37.07, § 3(a)(1) (West 2006 & Supp. 2014)). In *Ellison*, the court of criminal appeals addressed whether the trial court abused its discretion at the sentencing phase by admitting the opinion testimony of a probation officer that the defendant—who had pleaded guilty to sexual assault— was not a suitable candidate for probation. 201 S.W.3d at 722. The probation officer had degrees in psychology and criminal justice; had specialized training in sex-offender cases, in supervising sex offenders, and on violence and domestic violence; was responsible for supervising cases and writing presentence reports; and had interviewed the defendant and the complainant personally for the defendant's presentence report in that case. *Id.* at 723. The court of criminal appeals held that the probation officer was qualified as an expert under rule 702,

as well as to give her lay opinion based on her personal knowledge of Ellison under rule 701, and that the trial court did not abuse its discretion by admitting the opinion testimony of the probation officer during the punishment phase of Ellison's trial. *Id.* at 723–24. The court emphasized, however, that article 37.07, section 3(a)'s language—providing that evidence may be offered by either the State or the defendant "as to any matter the court deems relevant to sentencing"—does not give the trial court unfettered discretion to admit all proffered punishment evidence; the trial court's discretion is necessarily limited by the requirement that punishment evidence must be admissible under the rules of evidence and not be excluded under some other statute or rule. *Id.* at 721 (stating the jury "must get all its information from properly admitted evidence at the punishment phase").

### C. Trooper Hellinger's and Sheriff Compton's Testimony that Patterson Was Not a Suitable Candidate for Probation

After presenting its punishment case-in-chief and after Patterson presented his punishment evidence, the State re-called Trooper Hellinger in rebuttal and asked him whether he had an opinion as to whether Patterson was a good candidate for probation. The State had asked this same question to Trooper Hellinger during its punishment case-in-chief, but the trial court had sustained Patterson's objection that Trooper Hellinger was not a probation officer and had no expertise in how a person should be punished. During rebuttal, however, the trial court overruled Patterson's objection that Trooper Hellinger

6

was not qualified and had no personal knowledge of whether Patterson was suitable for probation and admitted Trooper Hellinger's testimony. Trooper Hellinger responded that his opinion was that Patterson was not a suitable candidate for probation.

The State also called the then-current Sheriff of Cooke County, Michael Compton, in rebuttal. Sheriff Compton had been elected and re-elected to four four-year terms as Cooke County Sheriff and had been serving as such for fifteen years; he had a total of forty-four years of law-enforcement experience. The State asked Sheriff Compton one question—his opinion as to whether Patterson would be a good candidate for probation. Sheriff Compton first stated that he did not know Patterson personally. Patterson objected, asserting that the State had failed to show that Sherriff Compton was qualified to testify to Patterson's suitability for probation, but the trial court overruled the objection and admitted Sheriff Compton's testimony. Sheriff Compton testified that he knew "a little bit about the case, not a whole lot. I would have an opinion on the type of case." The State asked Sheriff Compton his opinion based on a hypothetical question— assuming facts of the accident and also assuming that Patterson was still drinking at the time of trial—in response to which Sheriff Compton advised the jury to "send him to jail."

On cross-examination, Patterson's counsel asked Sheriff Compton whether, in his opinion, Patterson would be a suitable candidate for probation if he had no prior convictions. Sheriff Compton testified that would depend on the

7

individual and that it would be difficult for him to make that decision because it was not his responsibility to make that decision.

### D.  Trooper Hellinger's and Sheriff Compton's Opinions Were Not Admissible

Although evidence offered at the punishment phase of trial regarding the suitability of the defendant for probation is a matter "relevant to sentencing" under article 37.07, section 3(a) of the code of criminal procedure when the defendant seeks probation, the sentencing court must still determine whether this relevant evidence is admissible. *Id.* at 721–23. That is, the trial court must still determine whether the suitability-for-probation opinion testimony is being offered by a witness who is qualified to give such testimony either as an expert or based on personal knowledge*. Id.* at 723; *Vela*, 209 S.W.3d at 134 ("Without more than credentials and a subjective opinion, an expert's testimony that 'it is so' is not admissible.") (quoting *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 424 (5th Cir. 1987)). Here, as discussed below, the State failed to show that Trooper Hellinger or Sheriff Compton were qualified either as experts under rule 702 or as lay witnesses under rule 701 to offer an opinion on Patterson's suitability for probation.

The State offered no evidence that Trooper Hellinger had any personal knowledge of Patterson apart from his investigation of the wreck and his review of Patterson's blood-alcohol concentration. The DPS investigation added nothing relevant to whether Patterson was likely to drive drunk again at a high rate of

8

speed and kill someone else in another similar accident in the future. Nor did Trooper Hellinger personally talk to Patterson at the scene of the accident; Patterson was already being treated by a paramedic for his injuries when Trooper Hellinger arrived at the scene. Thus, the trial court could not have concluded that Trooper Hellinger's opinion was admissible based on his personal knowledge of Patterson so as to qualify him under rule 701 to provide a lay opinion as to Patterson's suitability for probation. *See* Tex. R. Evid. 701; *see, e.g.*, *Osbourn*, 92 S.W.3d at 535 (explaining that a lay witness may testify as to an opinion rationally based on the witness's perception, which means the witness must have personally observed or experienced the event).

Likewise, the State offered no evidence that Trooper Hellinger had any training, expertise, or experience in assessing when a defendant is a suitable candidate for probation. The court of criminal appeals in *Ellison* did not hold that all law-enforcement officers are qualified to testify regarding suitability for probation. Instead, the holding in *Ellison* was that a probation officer possessing ample professional training, education, and expertise was qualified to render such an opinion as an expert and also as a lay witness because she possessed personal knowledge about Ellison based on interviews of him. 201 S.W.3d at 722–24. Here, the only qualification possessed by Trooper Hellinger that is reflected in the record is that he has been employed by the Texas Department of Public Safety as a trooper—presumably to enforce the laws relating to public safety—for less than three years. We cannot infer, presume, or judicially

9

notice—solely from a law-enforcement officer's position as a DPS Trooper—that he also possesses experience, training, or expertise to determine whether Patterson, who had sustained months of sobriety as the result of intensive inpatient treatment, was suitable for probation or further chemical dependency treatment after a first conviction for an alcohol-related traffic offense that resulted in a homicide. *See Pham v. State*, 125 S.W.3d 622, 630–31 (Tex. App.—Houston [1st Dist.] 2003) (affirming trial court's determination that expert in sociology of gangs was not qualified to offer suitability-for-community-supervision opinion), *aff'd on other grounds*, 175 S.W.3d 767 (Tex. Crim. App. 2005); *accord Vela*, 209 S.W.3d at 134 (explaining that trial court properly excluded expert testimony because it was "no more than [the expert's] testimony dressed up and sanctified as the opinion of an expert"); *DeLarue v. State*, 102 S.W.3d 388, 398 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd) (recognizing general rule that police officers are not qualified to render expert opinions regarding accident based solely on their position as police officers).

In fact, on cross-examination, Trooper Hellinger candidly acknowledged that his opinion was based on only (1) the manner in which Patterson was driving at the time of the accident, (2) the fact that Patterson was intoxicated at that time, and (3) the fact that Patterson lived and worked in the community. Trooper Hellinger's opinion, at best, amounted only to speculation as to "what if" Patterson drinks and drives again; Trooper Hellinger said, "I see it day in and day out. People get killed from drunk driving. And if [Patterson's] out on the

highway, there's a good chance that he's going to do it, again. And it's going to be somebody else's family that's hurt." Trooper Hellinger acknowledged that "[i]f you could keep [Patterson] from drinking and driving, he mostly would not be a danger," but Trooper Hellinger said that it would depend on "how you're going to be able to stop [Patterson] from drinking and driving." Assuming that Patterson had not had a drink of alcohol since September 2011, Trooper Hellinger again responded, "He's going to be a danger if he's drinking. . . . Now, how you can keep somebody from drinking and driving is besides [sic] me. I have no idea how you're going to do that." This testimony by Trooper Hellinger demonstrates that he did not possess the training or expertise to provide an opinion that would be helpful to the jury as to whether incarceration for a few or many years in the penitentiary would be a more suitable sentence for an alcoholic defendant than additional intensive alcohol treatment in or out of a Substance Abuse Felony Program (SAFP) together with strict conditions imposed by the court thereafter for continued monitoring.[4] Absent any evidence (1) that Trooper Hellinger possessed any education, expertise, experience, or training in determining whether alcoholic defendants are in need of chemical-dependency treatment or additional such treatment or in determining whether defendants demonstrate sufficient willingness and ability to comply with conditions imposed by the court

---

[4]Patterson asked the jury to grant him probation and acknowledged that the trial court could place him in a SAFP facility. *See* Tex. Code Crim. Proc. Ann. art. 42.12, § 14(a) (West Supp. 2014).

11

for continuing outpatient treatment if probation is granted or (2) that Trooper Hellinger possessed any knowledge concerning success rates for treatment and recovery in Alcoholics Anonymous (AA) versus incarceration in a penitentiary, Trooper Hellinger was not qualified to express an expert opinion as to whether Patterson was a suitable candidate for probation.

We hold that the trial court abused its discretion by overruling Patterson's objection that Trooper Hellinger was not qualified to testify as to his opinion regarding Patterson's suitability for probation; Trooper Hellinger's opinion testimony was not admissible as lay-witness-opinion testimony under rule of evidence 701 or as expert-opinion testimony under rule of evidence 702. *See Fairow v. State*, 943 S.W.2d 895, 898 (Tex. Crim. App. 1997) (stating that "[i]f the proponent of the opinion [under rule 701] cannot establish personal knowledge, the trial court should exclude the testimony"); *Rodgers*, 205 S.W.3d at 527 (stating that "before admitting expert testimony under Rule 702, the trial court must be satisfied that . . . the witness qualifies as an expert by reason of his knowledge, skill, experience, training, or education"). We sustain the portion of Patterson's first issue complaining that the trial court abused its discretion by admitting Trooper Hellinger's suitability-for-probation opinion.

We next address Patterson's contention that the trial court likewise abused its discretion by allowing Sheriff Compton to testify to his opinion that Patterson should be sent to jail in answer to the question of whether Patterson was a suitable candidate for probation. The State produced no evidence that Sheriff

12

Compton had any personal knowledge about Patterson on which to base a lay opinion as to Patterson's suitability for probation. Sheriff Compton acknowledged that he did not "know [Patterson] personally at all" and that he knew only "a little bit" about the case. This testimony by Sheriff Compton establishes that no basis existed for the admission of Sheriff Compton's opinion as to Patterson's suitability for probation as a lay opinion under rule of evidence 701 based on Sheriff Compton's lack of personal knowledge or observation of Patterson. *See* Tex. R. Evid. 701; *Fairow*, 943 S.W.2d at 898.

The record is likewise devoid of evidence establishing that Sheriff Compton's years of serving as a sheriff in law enforcement included knowledge, experience, skill, training, or education to qualify him as an expert on whether Patterson was a suitable candidate for probation. The only qualifications Sheriff Compton testified that he possessed were that he was, indeed, "the Sheriff" of Cooke County; had served as such for fifteen years; and had a total of forty-four years of law-enforcement experience. Nonetheless, the State asked Sheriff Compton a "hypothetical question"—a technique typically reserved for questioning expert witnesses. *See, e.g.*, *United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005) (concluding that witness who was not testifying as an expert should not have been permitted to answer hypothetical question and emphasizing that a distinction between lay and expert witnesses is the ability to answer hypothetical questions), *cert. denied*, 546 U.S. 1169 (2006). But we cannot infer, presume, or judicially notice that the general training, education,

13

experience, or duties of a law-enforcement officer necessarily imparts expertise in determining whether alcoholic defendants are in need of chemical-dependency treatment or additional treatment; whether defendants demonstrate sufficient willingness and ability to comply with conditions of probation; or whether a defendant's successful, continued sobriety in treatment and recovery in AA sufficiently minimizes societal risk. For the same reasons we held above that Trooper Hellinger was not shown to be qualified to offer an expert opinion on Patterson's suitability for probation, we likewise hold that Sheriff Compton was not shown to be qualified to offer an expert opinion on Patterson's suitability for probation. *See* Tex. R. Evid. 702.

We hold that the trial court abused its discretion by overruling Patterson's objection that "proper qualifications have not been laid for [Sheriff Compton] to make such a statement" concerning Patterson's suitability for probation; Sheriff Compton's opinion testimony was not admissible as lay-witness-opinion testimony under rule of evidence 701 or as expert-opinion testimony under rule of evidence 702. *See Rodgers*, 205 S.W.3d at 527; *Fairow,* 943 S.W.2d at 898. We sustain the portion of Patterson's second issue complaining that the trial court abused its discretion by admitting Sheriff Compton's suitability-for-probation opinion.

14

### III. HARM ANALYSIS

### A. Standard of Review

The erroneous admission of evidence is nonconstitutional error. *Coble v. State*, 330 S.W.3d 253, 280 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 3030 (2011); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). Nonconstitutional error requires reversal only if it affects an appellant's substantial rights. *See* Tex. R. App. P. 44.2(b) ("Any other error, defect, irregularity, or variance that does not affect substantial rights must be disregarded."); *Barshaw v. State*, 342 S.W.3d 91, 93 (Tex. Crim. App. 2011). A substantial right is affected when the improperly admitted evidence had a "substantial and injurious effect or influence" on the jury's verdict. *Barshaw*, 342 S.W.3d at 93–94; *King v. State*, 953 S.W.2d 266, 267 (Tex. Crim. App. 1997). We will not overturn a verdict for nonconstitutional error if, after examining the record as a whole, we have "fair assurance" that the error did not influence the jury or had but a slight effect. *Barshaw*, 342 S.W.3d at 93. Conversely, a conviction must be reversed if the reviewing court has "grave doubt" that the result of the trial was free from the substantial effect of the error. *Id.* "Grave doubt" means that "in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error." *Id.* at 94. It is the responsibility of the appellate court to assess harm after reviewing the record, and the burden to demonstrate whether the appellant was harmed by a

15

trial court error does not rest on either the appellant or the State. *Coble*, 330 S.W.3d at 279.

In conducting a harm analysis, we examine the entire record and calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *Id.* at 286. Generally, we consider the entire record including any evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the error might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). In *Coble*, the Texas Court of Criminal Appeals provided more specific guidance as to how these factors apply in cases involving the erroneous admission—at the punishment phase of trial—of opinion evidence as to a defendant's likely conduct in the future that is offered to assist the jury in assessing punishment.[5] 330 S.W.3d at 286–88. Because *Coble* involved error in the punishment phase of a capital case by the erroneous

---

[5]*Coble* involved the appeal of a sentence of death imposed following a new trial on punishment. 330 S.W.3d at 261. The court of criminal appeals held that the trial court had erred by admitting psychiatric expert opinion testimony regarding "future dangerousness" at the new trial on punishment and applied a harm analysis using the above factors. *Id.* at 279–87. "Future dangerousness" in a capital case is analogous to "suitability for probation" in that the jury is called upon in both instances to predict a defendant's conduct in the future, that is, whether there is a "probability that [the defendant] would commit criminal acts of violence that would constitute a continuing threat to society." *Id.* at 265; *see also Petriciolet v. State*, 442 S.W.3d 643, 652–55 (Tex. App.—Houston [1st Dist.] 2014, pet. ref'd) (applying *Coble* harm analysis in noncapital aggravated assault case to error in admitting unreliable expert testimony in punishment phase of trial that defendant was at high risk for future violence based on "lethality assessment" test that was not shown to be a legitimate field of expertise).

16

admission of psychiatric expert opinion testimony regarding "future dangerousness," the court of criminal appeals framed the factors it examined as follows: (1) whether there was ample other evidence supporting the jury's finding that the defendant would commit future acts of violence; (2) whether the jury heard the same basic psychiatric evidence of Patterson's character for violence from another source; (3) the strength or weakness of the expert's conclusions, including whether those conclusions were effectively refuted, and (4) whether the State emphasized the erroneously admitted opinion testimony during argument. *Id.* We examine the entire record and utilize the general *Motilla* factors and the specific *Coble* factors—tailored to suitability-for-probation opinions—to calculate, as much as possible, the probable impact of the error upon the rest of the evidence. *See id.* at 286.

## B. Examination of the Entire Record

### 1. Evidence Presented by the State

On June 24, 2010, Patterson, who was sixty-five years old at the time, had a blood-alcohol concentration approaching three times the legal limit (0.23) when he crashed his Corvette into a tree, killing his brother who was a passenger. *See generally* Tex. Penal Code Ann. § 49.01(2)(B) (West 2011) (defining intoxication as a blood-alcohol level of .08 or greater). The State called four witnesses who graphically described the scene of the accident, including that the vehicle had crashed against a tree and was on fire and that Patterson's brother was lying on the ground also on fire and partially under the vehicle. An off-duty policeman

17

came upon the scene on his way home from work and pulled Patterson—who was dazed and in shock and whose face was covered with blood—from the driver's seat of his burning vehicle and assisted him to a distance safely away from the vehicle seconds before it was engulfed in fire from several explosions caused by the gas and fumes. The off-duty policeman testified that he had noticed a strong odor of alcohol on Patterson even over the smell of gas and fumes.

Two EMS units were dispatched to the scene. A paramedic who treated Patterson described Patterson's injuries as mostly soft-tissue lacerations to his hands, arms, and face and said that Patterson did not seem to know what had happened or what was going on. The paramedic testified that Patterson's speech had seemed slurred and said that he had smelled the odor of alcohol on Patterson as he had assessed Patterson's condition. The EMS crew immobilized Patterson's neck and spine on a backboard and loaded him into an ambulance. Another paramedic testified that his unit was directed to care for Patterson's brother, who had already been declared dead by that time.[6]

Trooper Hellinger was dispatched to the accident scene. Trooper Hellinger testified that the wreck had occurred on a sharp curve east of Gainesville on FM

---

[6]The paramedic who was assigned to attend to Patterson's brother said that third-degree burns had charred most of his body black and that his chest wall and abdomen were eviscerated with multisystem trauma. The autopsy report, however, showed no smoke or soot inhalation, indicating that Patterson's brother had died on impact from blunt-force trauma to the head before the fire had occurred.

18

902, which is a black-top asphalt road with a center stripe. By the time he arrived on the scene, the vehicle was wholly engulfed in fire, and the driver was receiving treatment from EMS.

Trooper Hellinger testified regarding the DPS investigation that night and the next day, as a result of which Patterson was determined to have been the driver of the vehicle and was charged with intoxication manslaughter. Trooper Hellinger testified with the aid of fifty-six photographs that were admitted into evidence and that depicted the vehicle, the trees, and the body of Patterson's brother. From his investigation, Trooper Hellinger determined the path that the vehicle had traveled from the point where it had left the roadway to its final resting spot, crashed against a tree. Based on the DPS investigation, he determined that the cause of the crash was Patterson's intoxication coupled with the unsafe rate of speed at which the vehicle had been traveling. A laboratory report admitted into evidence showed that Patterson's blood-alcohol concentration was 0.23 at the time of the offense.

When the State asked if Trooper Hellinger had an opinion as to whether Patterson should be sentenced to the penitentiary or placed on probation, the trial court sustained Patterson's objection that Trooper Hellinger was not a probation officer and had no expertise in how a person should be punished. After that statement, the State rested its punishment case-in-chief.

## 2. Evidence Presented by Patterson

The defense called numerous witnesses to testify on Patterson's behalf. They testified to having personally known Patterson as a resident in the Lake Kiowa community, and all either testified that Patterson was a suitable candidate for probation or were not asked that question but provided other details of Patterson's long-term alcoholism and of his recent sobriety.

The Volunteer Fire Chief of the Lake Kiowa Fire Department for twenty-eight years testified that he had known Patterson more than twenty years and said that he knew Patterson had been an alcoholic for the eight years preceding the trial. The Fire Chief had played golf with Patterson, had visited Patterson's home, and considered Patterson a friend. Prior to the accident on June 24, 2010, he had personally discussed with Patterson that Patterson was drinking too much and needed to stop. However, he had seen a marked change in Patterson since the fall of 2011. He knew that Patterson had gone to a substance-abuse center in Sherman, had been abstinent from alcohol since about August 2011, and was attending AA meetings. The Fire Chief had last seen Patterson the week before trial. On cross-examination, when the State asked whether the jury should "risk the county's future" by giving Patterson probation if Patterson, in fact, was not going to AA and was still drinking, the Fire Chief said that Patterson had never lied to him in all of the years he had known him. Based on his personal knowledge of Patterson before and after the

accident and his understanding of much of what is involved in probation, the Fire Chief testified that he believed Patterson was a good candidate for probation.

A pharmacist for many years in Lake Kiowa testified that he had known Patterson ten to fifteen years and that Patterson had alcohol issues during a number of those years. Patterson came in to the pharmacy every week or so. The pharmacist had noticed a significant difference in Patterson during the months leading up to the trial. The pharmacist had not smelled alcohol on Patterson's breath in six or seven months. Patterson seemed happy and upbeat, and the pharmacist believed that Patterson was really trying to change. He testified that with professional help, Patterson would be a good candidate for probation and that he would recommend probation.

A former coworker, who had lived in the community for twenty years and had worked with Patterson at the golf club, testified that he knew Patterson had been a drinker. He testified that he knew Patterson had quit drinking and had been going to AA since the summer of 2011. Patterson had told him about the wreck about three weeks after it had occurred; Patterson said that he had been drinking and had missed the curve, locally referred to as "Dead Man's Curve," and had killed his brother. Patterson's former coworker testified that from what he knew about probation, he believed Patterson would be a good candidate for probation. On cross-examination by the State, Patterson's former coworker said that he would not be surprised to learn that Patterson was drinking in August or September 2011; he said that everyone can have a weak moment.

21

A nurse practitioner testified that she runs a clinic in Lake Kiowa and had treated Patterson for routine ailments for ten years. She knew that Patterson had alcohol-abuse issues up until about September 2011. Since then, to her knowledge, Patterson had not consumed any alcohol. On cross-examination, she confirmed that her records showed that on August 22, 2011, Patterson told her that he had not consumed an alcoholic drink in two weeks; she was aware that Patterson had consumed two glasses of champagne in September 2011 but had not consumed an alcoholic drink since then. In January 2012, Patterson confirmed to her that he had not consumed an alcoholic drink since September 2011. She believed Patterson was very honest and was a "changed person"; she saw marked differences in him. She had treated numerous alcoholics and knew them to be capable of change if they wanted to change. She was familiar with the typical terms of probation and understood it "is not just you walk away." She testified that she would recommend that Patterson receive probation.

Donna Downes, the office manager at Gainesville Health and Rehabilitation, testified that Patterson had been bringing his Great Dane to the nursing home for three or four years to visit with the residents there. Downes testified that Patterson had never been obnoxious and had been kindhearted around the facility and that the dog was well-behaved. Downes had never smelled alcohol on Patterson's breath. She testified that she believes that Patterson is a good man, said that he is good with the residents, and opined that to spend time coming to the nursing home showed a certain amount of character.

Terry Weaver, the director of enrichment (including pet therapy) at another long-term facility near Gainesville, testified that Patterson also brought his Great Dane to that nursing home twice a month and would go in and out of the rooms and that the residents loved it. Seven to nine months before the trial, she had noticed the smell of alcohol on Patterson and had asked him to not come back. Patterson was cooperative and since then had started coming back to the nursing home; she said that she had noticed a change in Patterson's overall demeanor and appearance in the months preceding the trial.

A neighbor testified that Patterson took his dog to several nursing homes to meet with the elderly residents. The neighbor also had a dog that had played with Patterson's dog on a daily basis for several years while the two men visited outside. The neighbor said that Patterson had shown a "big difference" in the months preceding the trial; was "obviously" sober; and in his opinion, was a good candidate for probation for a first offense. He believed that Patterson should receive a "second chance."

Patterson's ex-son-in-law testified and concurred that, while he was married to Patterson's daughter, Patterson had an alcohol problem. He said that he had seen Patterson frequently during the six months leading up to the trial on the occasions when Patterson came over to visit Patterson's grandchildren, who resided with the ex-son-in-law. He testified that he had seen a marked difference in Patterson and honestly believed Patterson was sober. Patterson had talked to

23

him about the accident, had talked about his guilt, had cried about it, and had beat himself up over it and over losing his brother.

Patterson testified that he was sixty-six years old at the time of the trial and had lived in Lake Kiowa for thirteen years. His parents had been residents of Lake Kiowa. He had studied engineering in college, had worked at Lucas Aerospace in North Dakota for sixteen years, and then had retired and had moved back to Lake Kiowa to take care of his mother. Patterson testified that his wife had left him years before and had relinquished custody of their then six-year-old daughter to him. Patterson had raised her. Patterson confirmed that he had a clean record; had never been convicted of a felony; had never been charged with a DWI; and had no blemish on his record, not even a speeding ticket.

Patterson said that he had realized he was drinking too much years before the accident. But he was not ready to change; he thought he did not need it because "[i]t wasn't [him]." He went to a rehab facility in 2004 but had stayed only a few days for "detox."[7] He had attended AA off and on since then but could stop drinking only for a short time. He testified that he now knew that he had "caused a lot of the pain that's been in [his] life because . . . [he] wasn't being honest with [him]self." He acknowledged that it had hurt his daughter to grow up

---

[7]Patterson's ex-son-in-law and daughter testified that they had taken him to "rehab" twice. Each time, he had stayed only a few days and had stopped drinking only for a short time.

with a father who was an alcoholic, and as to their relationship at the time of the trial, he stated that she had completely "disowned" him.

On the date of the accident in June 2010, Patterson recalled that he and his brother had spent the day together, first cleaning up his brother's duplex in Gainesville and then working in Patterson's yard in Lake Kiowa. They had been drinking all day. Patterson was driving his brother back to town that evening and was exceeding the speed limit "a little." There was a straightaway before the curve; he knew the curve was there, but the car suddenly dropped down off the road eight to twelve inches because there was no shoulder. Patterson tried but could not get the car back on the road; he tried to stop, but the antilock brakes did not work in the grass. At the time of the accident, Patterson conceded that his speed was probably in the eighties.

Although the diagram drawn by Trooper Hellinger showed that the Corvette never rounded the curve but instead went wide off the far side of the road and kept going straight toward a grove of trees, one of which it grazed and one of which it finally hit, Patterson did not recall hitting the tree; the last thing he saw was the airbag that inflated. When Patterson came to, he did not know that his brother was dead; he testified that he kept "trying to hunt for him." An officer guided Patterson to a spot to sit down and said, "Your brother's gone."

On cross-examination by the State, Patterson admitted that his brother had died because he had crashed the Corvette and that he was responsible. Patterson admitted that he drank a "considerable amount" that day. He said that

25

at the time of the accident, he did not believe he was "intoxicated," or he would not have gotten behind the wheel. However, he agreed that the blood test was correct, that his blood-alcohol concentration was almost three times over the legal limit, and that "the law" said he was intoxicated. Patterson said that, at the time of the accident, he did not think his alcohol consumption affected his ability to keep his Corvette on the road. On redirect by his counsel, however, Patterson said that he had been referring to what he thought at the time of the accident and that it was the liquor talking; he admitted that he was "intoxicated" at the time of the accident and that his drinking had affected his operation of the vehicle.

Patterson also acknowledged that after the wreck in June 2010, he did not stop drinking immediately. He said his "dead date"—the date he stopped drinking—was August 11, 2011. There is virtually nothing in the record from the State or the defense about Patterson's conduct or drinking during the period from between the accident and August 2011—other than that he attended his brother's estate sale drunk shortly after the accident and disembarked from an airplane drunk for his daughter's wedding in September 2010, which was a few months after the accident. Patterson admitted that he had consumed two glasses of champagne in September 2011 at a birthday celebration. After that, he went to a nurse and a doctor; they helped him through the "bad time"; and then he finally entered treatment at the House of Hope, a rehabilitation center in Sherman. He said that he knows now that there is no way to conquer or abstain from alcohol without being honest with yourself. He knows now that he is

26

"powerless" over alcohol. He said that he will never be able to forget the accident and visits his brother's grave regularly. But he believed that he had started a "new beginning." Patterson asked the jury for a second chance with probation and said that he felt he could do it and that he would follow through and maintain his sobriety.

Patrick Grissom, a licensed chemical dependency counselor who had worked in that field since 1996, testified that he was employed by House of Hope and that he had treated Patterson in their intensive outpatient program for three and one-half months beginning October 31, 2011. Grissom testified that he has an associate's degree in counseling and substance abuse; that he attends substance-abuse education in all court-required programs, including DWI education for first-time offenders, anger management, drug-offender education, and interventions for repeat offenders; and that he works in the rehabilitation center's outpatient program and conducts individual counseling for substance abuse. Grissom testified that he had also worked in the penitentiary system in a SAFP facility and in a high-security unit in the institutional division of the Texas Department of Criminal Justice.

Grissom related that Patterson went through intake at House of Hope on October 27, 2011, and was accepted and began treatment on October 31, 2011. Grissom testified that he believes Patterson came to House of Hope with the purpose of wanting to change because of the traumatic event in his life of being intoxicated and killing his brother in the wreck, which caused Patterson to finally

27

open his eyes and take a new look at himself. Grissom said that Patterson had participated in both group and individual counseling at House of Hope three days a week and had never missed a session or an outpatient group meeting. As part of the program, patients are also required to attend three AA meetings a week, to participate in those meetings, and to obtain a sponsor—all of which Patterson did.

Grissom described Patterson as "struggling" when he first came in but stated that they worked on Patterson's ability to deal with his grief and alcoholism. One of their focuses was on exactly what alcoholism is, and Grissom testified that alcoholism has been recognized as a brain-chemistry disease by the American Medical Association since 1957. Grissom said that Patterson had successfully completed the program and that he had continued to come in voluntarily to visit with Grissom.

Grissom testified that his first choice for Patterson would be probation, "long-term," with requirements to "[m]ake him accountable" and to "[m]ake him go to [AA] meetings a lot." In his opinion, Patterson was serious about his sobriety and had progressed a great deal. Grissom also opined that Patterson would probably do well on probation and that he would be an "excellent probationer." Grissom said that recovery is a life-long process. He knew that the requirements of probation included "strong" conditions, including weekly urinalyses, public speaking to students, and participation in a twelve-step program, and he hoped that Patterson would receive a "long probation."

28

Alternatively, if Patterson had to be confined, Grissom testified that he would recommend a SAFP facility as part of his probation, not the regular institutional division because it would be very hard for Patterson to survive. Grissom said that there was no longer a SAFP in the institutional division because of budget cutbacks. According to Grissom, just being imprisoned in the institutional division would not help Patterson because there are specific dangers for someone with a passive personality; Grissom did not elaborate on these dangers. Grissom testified that in SAFP, Patterson would work on a program for his substance-abuse issues—even though he would still be confined, wearing prison garb, and eating prison food—and that after graduation from SAFP, he would move to a halfway house and then to a one- or two-year program in his community.

Patterson's AA sponsor testified that he is a recovered alcoholic who has been sober for twelve years. Patterson's sponsor said that he had met with Patterson once a week, that Patterson was working the twelve steps of AA, and that Patterson had worked through about half of the steps. Patterson's sponsor saw Patterson at AA meetings twice each week and believed that Patterson was genuine and sincere in trying to quit drinking. Patterson had done everything that he had been asked to do, and the sponsor believed that Patterson was staying sober. Patterson's sponsor had no indication that Patterson had been drinking. Patterson had told him about the accident and that he had been driving and drinking at the time of the wreck.

### 3. Other Rebuttal Evidence Presented by the State

After Patterson presented his punishment evidence, the State presented as rebuttal evidence Trooper Hellinger's and Sheriff Compton's suitability-for-probation opinions that were discussed above and also presented the following evidence.

The State called the manager of a Lake Kiowa store who testified that Patterson had been a customer at the store for years. She had not encountered any problems with Patterson until February 2010 (prior to the June 2010 accident) when she banned Patterson from her store because he had become belligerent, had hogged the counter when purchasing lottery tickets, and had made angry and disruptive outbursts; he had argued and yelled when he was asked to move aside for other customers. Since then, she said that Patterson had continued to try to contact her by phone and had given her "the finger" whenever he saw her outside. The last time she talked to him was probably July or August 2010, which would have been shortly after the accident. She testified that she had most recently seen him from a distance riding around Lake Kiowa in his golf cart with his dog "and beer" and that was "within the last week."

The State also called Patterson's daughter on rebuttal. She testified about Patterson's long history of drinking and said that Patterson was verbally and physically abusive when she was growing up. She described Patterson as a closet drinker; she knew that he drank a lot because she had found little stashes of alcohol in the family's vehicles and house. She said that Patterson's faster

30

driving started when he purchased the Corvette in 2009; one time, he frightened her by driving over 100 miles per hour on a back road around the lake, while she was on the phone with her husband, screaming for Patterson to stop. Patterson had been drinking on that occasion; she said she could smell it on him. As to whether Patterson was intoxicated on that occasion, she responded only that Patterson could "drink a fifth of vodka and still stand up." She testified that Patterson had admitted that he was an alcoholic many times in the past and that she had taken him to detox before. She also testified, however, that she had not seen Patterson for more than a year and was not aware that he had entered rehab in October 2011. She was not asked whether she believed that Patterson was a suitable candidate for probation.

Finally, the State called Russ Harper as a character witness. Harper was introduced only as an employee who worked for the Cooke County Sheriff's Office and who resided in Lake Kiowa. He said that he was familiar with Patterson's general reputation in Cooke County for truth and veracity and was of the opinion that it was bad and that Patterson's reputation for being a law-abiding citizen was likewise bad. Harper at first said that he did not know Patterson personally but then acknowledged that he did know Patterson enough to greet him. Harper related that he recalled seeing Patterson with his dog in George's Liquor Store at some unspecified time after the wreck in June 2010, but he did not see Patterson buy anything. Based on Harper's knowledge of Patterson and

what people in the community said, Harper was of the opinion that Patterson should not be given probation.

On cross-examination, Harper acknowledged that his opinion that Patterson had a bad reputation for truth and veracity was based only on conversations with people who said that Patterson had told them that he had quit drinking and who said that they later saw Patterson drinking. Who the people were and when or where the people had seen Patterson drinking was not revealed. Harper had not personally seen Patterson drinking.

Harper's opinion that Patterson had a bad reputation for being law-abiding was based on the single fact that Patterson had "broke[n] the law" one time by driving while intoxicated, which resulted in the wreck that killed his brother. Harper added that someone had reported to him at some time within the last two years that Patterson was seen by someone leaving Lake Kiowa driving his truck with an open container, which Harper said would have constituted another "offense." But Harper could provide no details and admitted that he could not confirm whether Patterson even had such a container.

## C. Other Testimony and Evidence that Patterson Was Not a Suitable Candidate for Probation; Analysis of the Strengths or Weaknesses of Trooper Hollinger's and Sheriff Compton's Opinions, Including Whether the Opinions Were Effectively Refuted

Error in the admission of evidence will not result in reversal "when other such evidence was received without objection, either before or after the complained-of ruling." *Coble*, 330 S.W.3d at 282 n.82 (citing *Valle v. State*, 109

32

S.W.3d 500, 509–10 (Tex. Crim. App. 2003) (holding that if party fails to object each time inadmissible evidence is offered or to obtain a running objection, error in admission of evidence is "cured")); *Leday v. State*, 983 SW.2d 713, 716–21 (Tex. Crim. App. 1998) ("Our rule . . . is that overruling an objection to evidence will not result in reversal when other such evidence was received without objection, either before or after the complained-of ruling."); *see also Anderson v. State*, 717 S.W.2d 622, 628 (Tex. Crim. App. 1986) ("Inadmissible evidence can be rendered harmless if other evidence at trial is admitted without objection and it proves the same fact that the inadmissible evidence sought to prove.").

The only witness, besides Trooper Hellinger and Sherriff Compton, to offer an opinion that Patterson should not be given probation was Harper. Harper, like Trooper Hellinger and Sheriff Compton, was not qualified either as a lay witness or as an expert witness to offer a suitability-for-probation opinion. Harper's knowledge of Patterson was based on the fact that they both resided in the Lake Kiowa community; Harper had spoken to Patterson but did not know him personally. No evidence exists in the record establishing the capacity in which Harper was employed by the Cooke County Sheriff's Office, but he was dispatched to the scene of Patterson's car accident on June 24, 2010, for crowd-control purposes. Harper claimed to have seen Patterson and his dog in George's Liquor Store on one occasion within a year of trial but said he did not see Patterson buy liquor. These two facts—what the scene of Patterson's

33

accident looked like and that at some unspecified time "within the last year,"[8] he saw Patterson at a liquor store but did not see Patterson buy liquor—are the only two facts personally known by Harper about Patterson. These two known facts do not qualify Harper to provide a lay opinion concerning Patterson's suitability for probation.[9] *See* Tex. R. Evid. 701 (providing that lay opinions are limited to those that are "(a) rationally based on the witness's perception"); *Osbourn*, 92 S.W.3d at 531 (explaining that the "perception" requirement of rule 701 requires "personal knowledge" as also required by rule 602). Likewise, the fact that Harper was employed, in some unidentified capacity with the Cooke County Sheriff's Office, does not qualify him to offer an expert opinion on probation eligibility. Although Harper's opinion that Patterson should not be given probation was inadmissible as either lay- or expert-opinion testimony, it was admitted without objection.

While the admission of the same or similar evidence without objection is said to render erroneously admitted testimony harmless, Harper's opinion testimony here was not the same or similar to that of Trooper Hellinger's or of Sheriff Compton's and therefore cannot be considered as rendering harmless

---

[8]Harper testified on March 21, 2012. Patterson testified that the date he stopped drinking was August 11, 2011. So Harper's testimony that he saw Patterson in George's Liquor Store within a year of trial does not necessarily conflict with Patterson's testimony that he stopped drinking in August 2011.

[9]While Harper could and did testify as to Patterson's reputation in the community, being qualified to offer a reputation opinion does not automatically qualify a witness to offer a lay or expert suitability-for-probation opinion.

34

the error in admitting Trooper Hellinger's and Sheriff Compton's opinions. *Cf. Coble*, 330 S.W.3d at 282 n.82 (holding that error in admitting unreliable testimony of expert did not affect defendant's substantial right to a fair sentencing hearing because complained-of testimony was not particularly powerful, certain, or strong and was "remarkably similar" to the inadmissible testimony complained of by the defendant; the same basic psychiatric evidence was admissible and admitted through independent experts; and the admissible evidence was quite ample regarding the probability that the defendant would commit acts of future violence); *Petriciolet*, 442 S.W.3d at 654 (holding that complained-of testimony was "weak" in that witness equivocated, emphasized her testimony was not predictive of anything, and asserted that expert testimony was not even necessary for jury to determine whether defendant posed a "high risk" for future domestic violence). In *Coble* and in *Petriciolet*, the erroneously-admitted testimony was not strong, was not powerful, and was weak; the error in admitting it was rendered harmless by other stronger, more powerful evidence setting forth the same or similar facts or opinions. But here, the opposite is true. The inadmissible opinions given by Trooper Hellinger, who offered graphic testimony concerning the scene of the accident, and Sheriff Compton—a popular Sheriff of Cooke County who had been elected and re-elected four times, and testified, "Send him to jail"—constituted powerful, certain, and strong testimony, bolstered by the full weight of the law-enforcement positions occupied by these witnesses. Harper, on the other hand, was called by the State to offer reputation testimony;

35

his opinions concerning Patterson's reputation were based on extremely limited facts, and his position with the Cooke County Sherriff's Office was undisclosed— other than that he had performed crowd control on the day of the accident. The opinions of Trooper Hellinger and of Sheriff Compton were different and of a higher caliber than the opinion of Harper; logically, the opinions of a Texas DPS Trooper and of Cooke County's long-time Sheriff himself will be given greater weight and credibility than the opinion of a lower-level, sheriff's office employee. To the jury, the opinions of Trooper Hellinger and of Sheriff Compton necessarily carried great authority and likely carried "exceptional weight and an aura of reliability which could lead the jury to abdicate its role" to determine Patterson's suitability for probation based on all the evidence. *See In re G.M.P.*, 909 S.W.2d 198, 206 (Tex. App.—Houston [14th Dist.] 1995, no writ) (holding that error in admitting police detective's expert opinion—that complainant in sexual-assault case was telling the truth—was not waived by lack of objection to substantially the same testimony from complainant's mother, which was not of same caliber as that of officer's expert opinion); *see also Armstrong v. State*, 718 S.W.2d 686, 702 (Tex. Crim. App. 1986) (op. on reh'g) (holding that error in admitting testimony of wife as to deceased's good character was not rendered harmless by "glancing testimony" of other witnesses, which could not be considered "same facts" nor remotely of the same emotional caliber as wife's testimony in inflaming jury's emotions); *cf. Lopez v. State*, 288 S.W.3d 148, 157–58 (Tex. App.— Corpus Christi 2009, pet. ref'd) (holding that testimony of clinical psychologist as

36

to victim's truthfulness, emphasized by State and bolstered by trial court's stated reason for overruling objection, was likely to carry greater weight than similar unobjected-to testimony of Texas Ranger). We cannot say that Harper's opinion testimony cured or rendered harmless that of Trooper Hellinger and of Sheriff Compton.

Nor were the suitability-for-probation opinions of Trooper Hellinger and Sheriff Compton effectively refuted because of the perception that these law-enforcement officers were independent, objective experts testifying to protect all of Cooke County as opposed to Patterson's witnesses who all had some sort of relationship with him. The State fostered this perception by arguing in closing argument that "he needed some window dressing for you. He doesn't believe a word that he told that counselor. He's not honest because drunks can't be honest." And also by arguing, "I think the troopers that responded and the officers that responded to that crime scene and had to clean up his mess deserve that [Patterson being sent to the penitentiary to put a stop to his drinking]."

### D. Other Evidence Concerning Whether Patterson Was a Suitable Candidate for Probation

It was undisputed that Patterson had suffered from the disease of alcoholism for many years, could drink a fifth of vodka in a day and still stand up, enjoyed driving his Corvette at high speeds on the back roads around Lake Kiowa, and pleaded guilty to the offense of intoxication manslaughter. In the

punishment trial, Patterson initially testified that he was driving only "a little over the speed limit" but then admitted that his speed was in the eighties when the Corvette left the road. Patterson likewise initially reluctantly admitted that he was intoxicated and that his intoxication contributed to causing the crash that killed his brother; yet, he did not dispute the laboratory report that his blood-alcohol concentration was almost three times the legal limit at the time of the crash. The record further shows that Patterson had never sought substance-abuse treatment prior to the accident; he had gone through a few days of "detox" on two occasions in prior years and had previously sporadically attended AA but had been able to quit drinking only for short periods of time. Patterson continued to drink after the accident until he entered outpatient rehabilitation at House of Hope more than a year and a half after the wreck and death of his brother.

On the other hand, it was undisputed that Patterson had a clean criminal and driving record at the time of the accident when he was sixty-five years old; he had no prior convictions, no prior DWI charges, and no speeding tickets on his record. According to the expert testimony of Patterson's counselor at House of Hope, who had personally worked with Patterson during inpatient treatment and who had continued to work with Patterson on an outpatient basis, Patterson was sincere in his desire to attain and maintain sobriety. Patterson had successfully completed both group therapy and individual counseling without missing a single session. According to Patterson's AA sponsor, Patterson was not drinking, continued to attend AA meetings on a regular basis, met with his sponsor each

38

week, and was working on the twelve steps of the AA program.  And according to both Patterson's counselor at House of Hope and his AA sponsor, Patterson had been sober since September 2011, a sustained period of almost six months at the time of Patterson's punishment trial in March 2012.  Both Patterson's counselor and Patterson's AA sponsor testified that in their opinion, Patterson was a good candidate for probation.  Patterson's counselor had both personal knowledge of Patterson and of the programs available in and outside the penitentiary system for treatment and of conditions of probation to give both expert and lay opinions (which the State did not dispute) on Patterson's suitability for probation.  Patterson's counselor testified that, in his opinion, his first choice for Patterson was a "long" probation with a requirement of "lots of" continued AA meetings or, in the alternative, confinement in a SAFP facility; he testified that a sentence of imprisonment would not benefit Patterson.

Witnesses who had known Patterson personally for years in the Lake Kiowa community testified that they believed Patterson was maintaining his new-found sobriety from September 2011 to the time of trial.  Each of these witnesses who were asked for their opinion about Patterson's suitability for probation, including a next-door neighbor who had visited with Patterson almost every day while their dogs played together, testified that in their opinion, Patterson was a suitable candidate for probation.  And contrary to the State's insinuations in cross-examining Patterson's witnesses, no witness testified that he or she had

seen Patterson drinking alcohol after the two glasses of champagne in September 2011.

Significantly, the lay witnesses who testified for the State in rebuttal—the store manager and Patterson's daughter—had not even talked to Patterson since the accident in June 2010, much less after he had gone through treatment at House of Hope.

### E. Whether the State Emphasized the Erroneously Admitted Opinion Testimony in Closing Argument

The State's theory during the punishment trial, from voir dire and opening statement through closing arguments, was that the jury must assess Patterson's punishment at a term of at least fifteen years' imprisonment in order to protect society. In closing arguments, the State did not expressly mention the opinions of Trooper Hellinger or of Sheriff Compton. Instead, the State drew an unstated comparison between the not-suitable-for-probation opinions offered by the State's law-enforcement witnesses and the suitable-for-probation opinions offered by Patterson's witnesses.

The State argued that Patterson had "tried to parade some people in here for window dressing about how he's a changed man" and that "[i]t's ironic . . . or it's interesting that no one they brought before you knew this Defendant." The State also argued that Patterson had lied to all of his neighbors and friends, as well as to his AA sponsor and to his House of Hope counselor; explained that the device placed on an alcoholic defendant's car as a condition of probation does

40

not prevent the defendant from driving; and predicted that Patterson would continue to drink and drive and would kill someone else on the road in the future if he was not confined in the penitentiary for what would be (to him at sixty-six years of age) essentially the rest of his life. Echoing the inadmissible opinion testimony of Trooper Hellinger and of Sheriff Compton, especially that of Trooper Hellinger that he did not know how Patterson could be kept from drinking, the State argued that the only suitable sentence for Patterson to prevent him from drinking and driving was imprisonment. The State argued, "I ask that you put a stop to it [Patterson's drinking by sending him to jail]. . . . I think that the troopers that responded and the officers that responded to that crime scene and had to clean up his mess deserve that." Thus, while the State did not directly reference Trooper Hellinger's and Sheriff Compton's opinions that Patterson was not a suitable candidate for probation and should be sent to jail, the State did argue that the opinions of Patterson's witnesses—that Patterson was a good candidate for probation—were simply "window dressing" based on lies, while law-enforcement opinions should be given greater weight because they had to "clean up [Patterson's] mess."

Despite Patterson's successful completion of intensive outpatient treatment through House of Hope from October 2011 to the middle of January 2012, his compliance with every order or request sent to him, his six months' sobriety at the time of trial, and his substance-abuse counselor's and sponsor's opinions that he was sober at the time of trial, the State also argued that

41

treatment had not worked in the past, that more treatment would not work, that Patterson would not abide by the terms and conditions of probation, and that no probation officer could keep Patterson from drinking and driving and killing someone else.

Finally, the State further argued that Patterson was simply a "mean and spiteful" person regardless of whether he was still drinking or not and that Patterson cared about no one but himself. The State ended its closing argument with a matter that is not reflected in the record—that Patterson pleaded guilty only because he wanted the jury to give him probation and that Patterson "went to counseling" only when he realized that the district attorney was not going to agree to a recommendation for probation.[10]

## F. Error was Harmful

After considering (1) the entire record, including the evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, the character of the alleged error, and how the error might be considered in connection with other evidence in the case; (2) Harper's opinion evidence that Patterson was not a suitable candidate for probation; (3) the strength or weaknesses of Trooper Hellinger's and of Sheriff Compton's opinions—including whether their opinions were effectively refuted by other evidence; and (4)

---

[10]We have found nothing in the record reflecting either that the State advised Patterson that it would not agree to a recommendation for probation or that Patterson decided to go to treatment only once he learned of the State's position.

whether the State emphasized the erroneously admitted evidence in closing argument, we do not have "fair assurance" that the error did not influence the jury or had but a slight effect. *See Barshaw*, 342 S.W.3d at 93. Based on our harm analysis, we have "grave doubt" that the result of Patterson's punishment trial was free from the substantial effect of the trial court's errors in admitting the opinion testimony of Trooper Hellinger and of Sheriff Compton that Patterson was not a suitable candidate for probation. *See id.*; *see also* Tex. R. App. P. 42.2(b). We therefore sustain the remainder of Patterson's first and second issues asserting harm from the erroneous admission of Trooper Hellinger's and Sheriff Compton's opinions that he was not a suitable candidate for probation.

## IV. CONCLUSION

Having sustained Patterson's first and second issues challenging the admission of Trooper Hellinger's and Sheriff Compton's suitability-for-probation opinions and asserting that the error in admitting the opinions was harmful, we reverse the trial court's judgment as to Patterson's sentence and remand this cause for a new punishment hearing.

/s/ Sue Walker
SUE WALKER
JUSTICE

PANEL: WALKER, GABRIEL, and SUDDERTH, JJ.

PUBLISH

DELIVERED: May 14, 2015

43