

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-22-00155-CR

_____

MICHAEL EARL TRANSUE, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1540729D

---

Before Kerr, Bassel, and Wallach, JJ.
Memorandum Opinion by Justice Wallach

## MEMORANDUM OPINION

Appellant Michael Earl Transue appeals from his conviction for aggravated sexual assault of his five-year-old granddaughter, Chloe.[1] *See* Tex. Penal Code Ann. § 22.021(a)(2)(B). In four issues, he challenges the trial court's admission of extraneous offenses (issues one through three) and the trial court's failure to submit a voluntariness instruction under Texas Penal Code Section 6.01. Because we hold that the trial court did not abuse its discretion in admitting evidence of some of the extraneous offenses, that Transue was not harmed by the admission of evidence of the other extraneous offenses, and that Transue was not entitled to a voluntariness instruction, we will affirm.

## Background

Transue is Chloe's grandfather. On a Monday in January 2018, Transue babysat for Chloe and her brother because it was a school holiday, and their father, Ethan, had to work. Ethan had been married to the children's mother, Grace, but by that time, they were divorced or in the process of finalizing their divorce. Grace had moved with the children from Bedford to College Station, and the children returned to Bedford on weekends to stay with Ethan. Transue and his wife also lived in Bedford.

---

[1]To protect the complainant's anonymity, we use an alias to refer to her and to some of her family members. *See* Tex. Const. art. I, § 30(a)(i); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

After the holiday weekend, Ethan returned the children to Grace, and they came back to Bedford the next weekend. That Saturday, Chloe told Ethan that when she and "Grampy" were in the bathtub, she "put [her] mouth on Grampy's peepee." "Grampy" is Transue. Ethan told Chloe that what her grandfather had done was wrong, and Chloe responded, "[B]ut, Daddy, he said he liked it."

Ethan immediately called Grace, and after a discussion, they called Child Protective Services. Ethan also contacted the Bedford police.

Soon thereafter, Chloe underwent two forensic interviews in College Station. During the first, on January 25, Chloe did not mention the sexual assault.[2] Then, on February 5, Chloe underwent a sexual-assault examination by a pediatric nurse practitioner. The exam took place at the advocacy center at which Chloe's forensic interview had been conducted. Before that exam, Ethan and Grace had taken Chloe out to lunch, and during lunch Chloe had been very apprehensive. She told her parents that she was scared that the people at the advocacy center were going to laugh at her. Her parents assured her that she could trust them. During the exam that afternoon, Chloe told the nurse that one day she had been with Grampy and she had "put [her] mouth on his noodle." Chloe also told the nurse that it had happened only once and that Transue did not touch her body.

_____

[2]The interviewer asked Chloe if anyone had touched her private parts or if she had ever told anyone that she had, and Chloe denied it, other than a time when she and her brother had played too hard. She also denied having ever seen anyone else's private parts.

3

Based on Chloe's statements to the nurse, the second forensic interview was arranged for the same day with the same interviewer who had conducted the previous interview. Once again, Chloe did not disclose any abuse to the interviewer.[3] Ethan was not surprised that Chloe did not want to talk to the interviewer during either interview because he knew that she was anxious and uncomfortable. The video recordings of Chloe's interviews were admitted at trial and published to the jury.

Bedford police detective Patrick Ripley interviewed Transue. At the interview, Transue provided a written statement in which he stated that while babysitting on the day in question, he had decided to take a hot shower because it helped with his pain from various medical issues. He claimed that Chloe had come into the bathroom without his noticing, grabbed his penis, and kissed it, and that when he chastised Chloe, she became angry and left the bathroom.

Grace told Ripley about improper sexual conduct that Transue had committed against her in 1990, when she was a child. According to Grace, when she was five, she

_____

[3]During the interview, Chloe seemed distracted and had a hard time sitting still. The interviewer asked her about her exam with the nurse. Chloe said the exam was so that the nurse could give her a check-up to make her healthy and strong. Chloe then started doing sit-ups on the beanbag chair in which she was sitting. The interviewer then asked if Chloe knew anyone who had been touched on their private parts. Chloe said, "Yes" and named someone not involved in this case. When asked to repeat what she had said, rather than answer, Chloe began doing a backbend on the beanbag chair. The interviewer then asked Chloe if she had seen anyone else's private parts or if anyone had asked her to touch their private parts, and Chloe, still lying on her back across the beanbag chair, said no.

4

and Transue were in the bathtub together, and Transue encouraged her to touch his penis.

When Grace talked about the case with her uncle Ryan, Transue's younger brother, Ryan told her that Transue had also committed sexual acts against him when he was a child in the 1970s; Transue is almost seventeen years older than Ryan. Ryan described three times when Transue performed oral sex on him. One of those incidents occurred in a bathtub, and during that encounter, Transue also tried to talk Ryan into performing oral sex on him.

The grand jury indicted Transue for intentionally or knowingly causing his sexual organ to contact the mouth of Chloe, a child under fourteen years of age. *See id.* § 22.021. The indictment further alleged that Chloe was under six years old at the time of the offense. *See id.* § 22.021(f)(1) (increasing the maximum penalty for an offense committed against a child under six years old).

The State filed a notice of intent to introduce extraneous offenses regarding the acts against Grace and Ryan. The State further noticed its intent to introduce Transue's 1974 conviction in California for aggravated sexual assault by "lewd acts" with Alex Hopkins,[4] a minor child. Transue had pled guilty to that offense. *See* Cal. Penal Code § 288.

---

[4]Alex Hopkins is a pseudonym.

The California complaint charging Transue with the aggravated-sexual-assault offense also included fourteen other sexual offenses against three minor boys—Alex Hopkins, Harry Hopkins, and John Foster.[5] The complaint further included three drug offenses: possessing drug paraphernalia, possessing amphetamines, and providing marijuana to John Foster, a minor. All of the offenses were alleged to have been committed in October 1974. The plea papers related to the complaint and to Transue's guilty plea contain no indication that Transue had pled guilty to the other offenses, and there is no indication in the record that he was ever tried for them. Nevertheless, the State supplemented its notice to include them.

Transue filed a motion to exclude evidence of the extraneous offenses. After a hearing, the trial court overruled Transue's objections.

During trial, Grace testified about the incident with Transue in the tub when she was a child. Ryan also testified about Transue's actions toward him when he was a child, and he identified one of the complainants in the California complaint, John Foster, as "the nephew of a mutual friend of both my mother and my brother [Transue], who had taken him into her home because, I guess, he had had trouble at home—at his own home." Ryan did not know the other two boys named in the California complaint.

---

[5]Harry Hopkins and John Foster are also pseudonyms.

During Ripley's testimony about the investigation, the State sought admission of State's Exhibit 2, which included the California complaint and the documents related to his guilty plea. Transue's attorney objected that "there's no finding of guilt, there's no plea, there's no judgment, [and] [t]here's no admission by [Transue]" related to any of the offenses in the complaint other than the one offense to which Transue had pled guilty. He also objected on the basis of hearsay and Texas Rule of Evidence 403. The trial court overruled the objections. However, the State published to the jury only the plea documents related to the adjudicated offense against Alex Hopkins and did not question witnesses about the unadjudicated offenses or mention them in its opening or closing arguments.

The State also put on testimony from Lindsey Dula, who works as a forensic interviewer with Alliance for Children, a children's advocacy center in Tarrant County. Dula testified that Chloe's failure to make an outcry statement in the forensic interviews is "not a conclusive thing" and that the interview room had items in it that could distract a five-year-old child from making an outcry. Dula stated that some of the interviewer's questions, such as, "[A]re you scared of anyone," and "Has anyone hurt you," might not lead to an outcry when a child was abused by someone the child knew, if the child was not hurt, or if the child did not understand that he or she had been sexually abused. Dula further stated that the questions asking Chloe if she had ever touched someone else's private parts or if anyone had touched hers would not necessarily have elicited an outcry because children Chloe's age do not understand

7

that "touching" can include any kind of contact, not just touching with one's hand, and so Chloe may not have understood that she was being asked if she had been told to put her mouth on someone's penis.

Chloe also testified at trial. Chloe told the jury that on the day of the offense, Transue asked her to go into the bathroom. When she did so, Transue told her to take her clothes off and get into the bathtub. She complied, and then Transue "put his private part in [her] mouth."

At the charge conference, Transue requested the following instruction under Texas Penal Code Section 6.01:

> [A] person commits an offense only if he voluntarily engages in conduct[;] therefore, if you believe from the evidence beyond a reasonable doubt that the Defendant's sexual organ contacted the mouth of [Chloe], as alleged in the indictment, but you further believe from the evidence or you have a reasonable doubt thereof that the conduct act was not the voluntary act or conduct of the Defendant, you will acquit the Defendant and say by your verdict not guilty.

The trial court overruled Transue's request. The jury found Transue guilty.

## Discussion

Transue's first three issues challenge the trial court's admission of the extraneous-offense evidence. His first issue challenges the trial court's admission of the unadjudicated sex-and-drug extraneous offenses in State's Exhibit 2, the 1974 California complaint and related plea documents, because no evidence proves beyond a reasonable doubt that he committed them. In his second issue, Transue argues that the trial court erred by admitting in the guilt–innocence phase of the trial

8

the three unadjudicated extraneous drug offenses in the California complaint because they are not one of the extraneous offenses allowed to be admitted under Texas Code of Criminal Procedure Article 38.37. *See* Tex. Code Crim Proc. Ann. art. 38.37. In his third issue, he argues that the trial court erred by admitting all of the extraneous offenses—the offenses in the California complaint and the evidence about the abuse of Ryan and Grace—because they were too remote to be probative.

To simplify our analysis, rather than addressing Transue's issues in order, we first address the part of his third issue challenging the admissibility of the testimony of Ryan and Grace and the evidence related to the adjudicated California offense. We then jointly address the parts of all three issues that relate to admission of the part of the California complaint setting out the unadjudicated California offenses.

## I. The Offenses Against Ryan and Grace and the Adjudicated California Offense

### A. Admission of Extraneous Sex Offenses—Remoteness

In a prosecution for a sexual offense against a child, Texas Code of Criminal Procedure Article 38.37 authorizes admission of extraneous sexual offenses, notwithstanding Texas Rules of Evidence 404 and 405. *Id.* art. 38.37 § 2. The article does not limit the admission of an extraneous offense based on when the offense was committed. However, Article 38.37 is subject to Texas Rule of Evidence 403. *See Dies v. State*, 649 S.W.3d 273, 284 (Tex. App.—Dallas 2022, pet. ref'd); *Perez v. State*, 562 S.W.3d 676, 688 (Tex. App.—Fort Worth 2018, pet. ref'd). Under that rule, the

trial court "may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, or needlessly presenting cumulative evidence." Tex. R. Evid. 403.

A Rule 403 analysis includes consideration of four factors:

(1) "how compellingly the extraneous offense evidence serves to make a fact of consequence more or less probable—a factor [that] is related to the strength of the evidence presented by the proponent to show the defendant in fact committed the extraneous offense" and

(2) "the force of the proponent's need for this evidence to prove a fact of consequence, i.e., does the proponent have other probative evidence available to him to help establish this fact, and is this fact related to an issue in dispute," balanced against

(3) "the time the proponent will need to develop the evidence, during which the jury will be distracted from consideration of the indicted offense"; and

(4) "the potential the other offense evidence has to impress the jury 'in some irrational but nevertheless indelible way.'"[6]

---

[6]The Court of Criminal Appeals has also phrased these factors differently to more closely reflect the language of Rule 403: (1) the inherent probative force of the proffered item of evidence; (2) the proponent's need for that evidence; (3) any tendency of the evidence to suggest decision on an improper basis; (4) any tendency of the evidence to confuse or distract the jury from the main issues; (5) any tendency of the evidence to be given undue weight by a jury that has not been equipped to evaluate the probative force of the evidence; and (6) the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted. *Gigliobianco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006). However, the court still uses the phrasing set out in *Mozon. See, e.g., Inthalangsy v. State*, 634 S.W.3d 749, 758 (Tex. Crim. App. 2021).

*Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999) (quoting *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997)); *see also Sanders v. State*, 422 S.W.3d 809, 815 (Tex. App.—Fort Worth 2014, pet. ref'd) (citing *Reese v. State*, 33 S.W.3d 238, 240–41 (Tex. Crim. App. 2000)). Because remoteness can lessen the probative value of extraneous-offense evidence, it is an aspect that the trial court should consider in evaluating an offense's probativeness. *West v. State*, 554 S.W.3d 234, 239–40 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

"If judicial restraint is ever desirable, it is when a Rule 403 analysis of a trial court is reviewed by an appellate tribunal." *Montgomery v. State*, 810 S.W.2d 372, 379 (Tex. Crim. App. 1990) (quoting *United States v. Long*, 574 F.2d 761, 767 (3d Cir. 1978)). Thus, when the balance is close, the reviewing court "should favor admission, in keeping with the presumption of admissibility of relevant evidence." *Sanders*, 422 S.W.3d at 815. We reverse a trial court's determination under a Rule 403 balancing test "rarely and only after a clear abuse of discretion." *Montgomery*, 810 S.W.2d at 392 (op. on reh'g) (quoting *United States v. Maggitt*, 784 F.2d 590, 597 (5th Cir. 1986)). "Considering that the trial court has the best view of the evidence, an appellate court will uphold a trial court's ruling on admissibility so long as it is within the 'zone of reasonable disagreement.'" *Inthalangsy*, 634 S.W.3d at 754.

## B. Rule 403 Application

Transue argues in his third issue that the extraneous offenses were not probative and should not have been admitted under Rule 403. His brief focuses

primarily on the gap in time between the offense alleged in this case and the extraneous offenses. He also argues under this issue that the offenses against Ryan and the California adjudicated offense are too dissimilar from the offense against Chloe to be probative because those extraneous offenses (1) involved a male complainant and (2) involved his touching the penis of the complainant, rather than the complainant's touching his penis.

## 1. Probative Value of the Extraneous Sex Offenses

We disagree that the extraneous sex offenses are too dissimilar to the offense against Chloe to be probative. The offenses against Ryan, the one against Grace, and the one against Chloe all involved a minor family member. As the State points out, the adjudicated California offense, the act involving Grace, and Transue's acts against Ryan all involved "not . . . penetrative sex but . . . penile manipulation—either Transue's or the [complainant's]." The offenses against Grace and Chloe involved Transue's being in a bathtub, as did one of the incidents described by Ryan. Further, Ryan's testimony included a description of an instance when Transue asked Ryan to perform oral sex on him. Although the jury did not hear evidence about the details of the adjudicated California offense other than that it involved Transue's committing "a lewd and lascivious act upon and with the body and certain parts" of a young male, the offense also involved a minor, and Transue pled guilty to that offense.

Regarding Transue's second and primary argument regarding probativeness, we further disagree that the offenses were too remote. Remoteness of an extraneous

12

offense does not, by itself, require exclusion of extraneous-offense evidence. *Dies*, 649 S.W.3d at 285. "Rather, remoteness is but one aspect of an offense's probativeness the trial court is to consider along with the other factors in the Rule 403 analysis." *Id.* (quoting *West*, 554 S.W.3d at 239–40).

The adjudicated California offense and the offenses against Ryan occurred in the 1970s, around forty-eight years before trial. The offense committed against Grace occurred around thirty-two years before trial. We held in a previous case that extraneous acts were too remote from the time of trial to be probative because they had occurred fifty years before and had not resulted in convictions, and because there had been no intervening misconduct to narrow the time gap. *See Perez*, 562 S.W.3d at 690. We reach a different conclusion here. For one thing, the California offense resulted in a conviction, unlike the extraneous acts in *Perez*. For another, the offense against Grace narrows somewhat the time gap between the acts against Ryan and the offense against Chloe. Further, the adjudicated California offense, the acts against Ryan, and the act against Grace have similarities to the offense against Chloe that strengthen the probative value of the extraneous offenses. *See Dies*, 649 S.W.3d at 285. This factor weighs in favor of admissibility.

### 2. State's Need for the Evidence

Regarding the second factor, the State needed the evidence. The State had little evidence to establish the offense other than Chloe's testimony and the testimony of the two witnesses to whom she had made her outcry statements. Although forensic

interviewer Dula testified that Chloe's failure to make outcry statements in her forensic interviews did not conclusively establish that the assault had not occurred, Dula's testimony was not evidence that the assault did occur. Transue's story was not to deny the incident but to claim that he had been a passive and unwilling participant in what happened. Transue's attorney emphasized in closing arguments that even if the jury accepted Chloe's outcry statements, all she had said was that she had put her mouth on Transue's penis, not that he had made her do it or had told her to do so. He also questioned the investigating detective about the fact that in Chloe's statements to her father and to the pediatric nurse practitioner, she never said that Transue had made her put her mouth on his penis or had asked her to do it.

Further, Transue's attorney repeatedly brought up the fact that Chloe had not reported any abuse by Transue in either forensic interview. His attorney asked Chloe about the forensic interviews and whether she had told the truth during them. The attorney asked multiple witnesses questions about the fact that in her interviews, Chloe had made statements suggesting possible inappropriate touching of her by her younger brother,[7] whereas she had not reported anything of the kind against Transue

_____

[7]Chloe's brother was three years old at the time. In Transue's attorney's opening statement, he told the jury members that they would be watching Chloe's forensic interviews and that "[n]obody else did anything sex—she does mention her [younger brother] had done something sexually with her[,] and I'm not really concerned. He's a young man. I'm not concerned about that. But no one else did anything, no one."

in the interviews. He also emphasized this fact in opening statement and closing arguments.

In summary, without the extraneous-offense evidence, "the State's case essentially would come down to the word of [the] complainant against [Transue's]." *West*, 554 S.W.3d at 240. "There was no physical evidence or eyewitness testimony supporting [Chloe's] allegations, . . . several of the State's witnesses . . . basically repeated what [Chloe had] told them," *see id.*, and Transue's attorney thoroughly challenged the credibility of her outcry statements. Thus, the State had a definite need for this evidence, and this factor weighs in favor of its admissibility.

### 3. Time Spent Developing the Evidence

We disagree with Transue that the time spent on the evidence, during which the jury was not considering the offense against Chloe weighs against admissibility. The State and Transue agree that the challenged evidence was developed over 42 pages out of 324 pages of testimony, or just under thirteen percent of the total trial testimony. That figure includes not only the time that the State spent on developing the evidence but also the time that Transue spent on cross-examination. *See, e.g., Inthalangsy*, 634 S.W.3d at 759 (holding that the State did not spend an inordinate amount of time on evidence relating to the death of a kidnapping victim, in a case charging defendant with committing murder of another person in the course of the kidnapping, when four out of the State's sixteen witnesses testified partially or exclusively about the kidnapped person's death). The development of the extraneous-

15

offense evidence did not take up an inordinate amount of time. This factor weighs in favor of admissibility. *See id.*; *Drew v. State*, No. 03-21-00392-CR, 2023 WL 2718452, at *9 (Tex. App.—Austin Mar. 31, 2023, no pet.) (mem. op., not designated for publication).

### 4. Effect on the Jury

With the final factor, although "evidence of previous child sexual abuse is inherently inflammatory by nature," Grace's allegation of abuse was similar to Chloe's. *See Dies*, 649 S.W.3d at 286. On the other hand, Ryan's allegations involved acts on more than one occasion. However, we do not believe that the evidence relating to Grace, Ryan, or Alex Hopkins was unfairly prejudicial. *See Wells v. State*, 558 S.W.3d 661, 670 (Tex. App.—Fort Worth 2017, pet. ref'd) (holding that extraneous offense evidence was prejudicial, "but not unfairly so" because "its prejudicial nature [arose] from the fact that it was especially probative of [the a]ppellant's propensity to prey on underage members of his household"). The effect of the evidence on the jury may have been indelible, but if so it was not irrational, given the similarity of the nature of the offenses and that the legislature has authorized evidence of unadjudicated sexual offenses in sexual-assault cases. *See Sanders*, 422 S.W.3d at 815; *see also* Tex. Code Crim Proc. Ann. art. 38.37. We see no indication that the challenged evidence confused or distracted the jury from the main issue in the case, was given undue weight by the jury, or suggested a decision on an improper basis. The evidence presented was not

the kind of evidence that the jury was unequipped to evaluate. Therefore, this factor does not weigh against admissibility.

### C. Conclusion

"Because Rule 403 permits the exclusion of admittedly probative evidence, it is a remedy that should be used sparingly, especially in 'he said, she said' sexual-molestation cases that must be resolved solely on the basis of the testimony of the complainant and the defendant." *Hammer v. State*, 296 S.W.3d 555, 568 (Tex. Crim. App. 2009). The testimony of Grace and Ryan and the adjudicated California offense were highly relevant "as compelling propensity evidence" and thus needed to rebut Transue's attacks on the credibility of Chloe's outcry statements. *See Turpen v. State*, No. 05-22-00284-CR, 2023 WL 3674600, at *4 (Tex. App.—Dallas May 26, 2023, no pet.) (mem. op.). After considering those and the other relevant factors, we conclude that Transue failed to rebut the presumption of admissibility. Accordingly, the trial court did not abuse its discretion in admitting the evidence.

## II. The Unadjudicated California Sex-and-Drug Offenses

In the trial court, Transue also challenged the admission of the unadjudicated California offenses. On appeal, in addition to complaining about the remoteness of the offenses, Transue cites Code of Criminal Procedure Article 38.03 to assert that because a charging instrument gives rise to no inference of guilt at a defendant's trial, the California complaint was "evidence of nothing." *See* Tex. Code Crim Proc. Ann. art. 38.03 (providing that "[t]he fact that [a defendant] has been arrested, confined, or

17

indicted for, or otherwise charged with, the offense gives rise to no inference of guilt at his [or her] trial"); *cf. Mendiola v. State*, 21 S.W.3d 282, 286–87 (Tex. Crim. App. 2000) (Keller, J., dissenting) (noting that the court had never considered whether the rule in Article 38.03 applies to extraneous offenses but that application of the rule to such offenses "seem[ed] logical" because "being accused is no evidence of guilt"). As Transue notes, the plea documents contained in State's Exhibit 2 do not state that any of the unadjudicated counts had been waived as part of a plea agreement, and they contain no acknowledgement by Transue of his guilt of those offenses. The only evidence offered by the State relating to the California complaint's allegations about the unadjudicated offenses was the complaint itself.[8] That is, the State offered no evidence to show that Transue had committed those offenses. *But c.f. Tanash v. State*, 468 S.W.3d 772, 775 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (upholding admission in guilt–innocence stage of testimony from arresting police officer regarding the appellant's prior arrest). We will assume for purposes of this opinion that admitting the California complaint without redacting the unadjudicated offenses

---

[8]The State cites several cases for the proposition that evidence that uncharged or unadjudicated extraneous offenses may be introduced in the guilt–innocence stage. The State is correct, but each case that it cites involved a witness testifying about the extraneous offense. *See Castillo v. State*, 573 S.W.3d 869, 879 (Tex. App.—Houston [1st Dist.] 2019, pet. ref'd); *Curry v. State*, No. 2-07-359-CR, 2008 WL 5265187, at *1 (Tex. App.—Fort Worth Dec. 18, 2008, pet. ref'd) (mem. op., not designated for publication); *Beasley v. State*, 838 S.W.2d 695, 701 (Tex. App.—Dallas 1992, pet. ref'd). It cites no case involving the admission of only a charging instrument in an attempt to prove an unadjudicated offense during the guilt–innocence stage.

was an abuse of discretion. *See, e.g.*, Tex. Code Crim. Proc. Ann. art. 38.37 § 2-a (providing that before admitting extraneous sexual-offense evidence, the trial court must hold a hearing to determine that the evidence likely to be admitted at trial will be adequate to support a finding by the jury that the defendant committed the separate offense beyond a reasonable doubt); *Inthalangsy*, 634 S.W.3d at 757 (recognizing that the standard of proof required to admit evidence of extraneous offenses is beyond a reasonable doubt). We will therefore review the record to determine if the error[9] is reversible. *See* Tex. R. App. P. 44.2.

**A. Standard of Review**

Because a trial court's erroneous admission of evidence is nonconstitutional error, our review of the error is governed by Rule 44.2(b) of the Texas Rules of Appellate Procedure. *Patterson v. State*, 508 S.W.3d 432, 440 (Tex. App.—Fort Worth 2015, no pet.). That rule requires us to disregard any nonconstitutional error that does not affect an appellant's substantial rights. Tex. R. App. P. 44.2(b). A substantial right is affected when the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *see King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error

---

[9]We agree with Transue that the three drug offenses in the complaint were not admissible under Article 38.37, and we cannot see how they have relevance to proving the offense against Chloe unless used as prohibited character evidence. *See* Tex. R. Evid. 404(b); *see also* Tex. Code Crim. Proc. Ann. art. 38.37.

does not affect a substantial right if the appellate court has a fair assurance from an examination of the record as a whole that the error did not influence the jury or that it had but a slight effect. *Macedo v. State*, 629 S.W.3d 237, 240 (Tex. Crim. App. 2021). In deciding that question, we consider (1) the character of the alleged error and how it might be considered in connection with other evidence, (2) the nature of the evidence supporting the verdict, (3) the existence and degree of additional evidence indicating guilt, and (4) whether the State emphasized the complained-of error. *Id.*; *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory, any defensive theories, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

**B. Analysis**

Regarding the evidence in the case, the jury had before it Chloe's testimony, which was sufficient by itself to support a conviction. *See Gonzales v. State*, 477 S.W.3d 475, 480 (Tex. App.—Fort Worth 2015, pet. ref'd). But the jury also learned that Chloe had participated in two forensic interviews and that in both interviews, she said nothing about the incident. On the other hand, Chloe's father and the pediatric nurse practitioner both testified about outcry statements that Chloe had made to them. The jury also heard the probative testimony of Grace and Ryan about similar past sexual abuse by Transue and that Transue had pled guilty to another sexual offense against a minor, Alex Hopkins, in California. The nature of the unadjudicated sexual offenses

20

were not more serious than the offenses that the jury heard Transue had committed against his family members, and the drug offenses were even less serious.

As for the State's emphasis of the evidence, although the State asked Ryan during his testimony if he knew John, Alex, or Harry, the State did not ask any witness about the unadjudicated offenses. The State did not mention the unadjudicated offenses in its opening or closing arguments. When the State published State's Exhibit 2 to the jury, it read aloud only the plea documents associated with that offense.

As for the jury charge, we note that an instruction regarding extraneous offense evidence can minimize any harm resulting from the admitting the evidence of the offense. *See Clifford v. State*, 653 S.W.3d 1, 13 (Tex. App.—Austin 2022, pet. ref'd) (citing *Beam v. State*, 447 S.W.3d 401, 405 (Tex. App.—Houston [14th Dist.] 2014, no pet.), and noting that jury instruction can minimize harm from extraneous offense evidence). Here, the trial court instructed the jury that it could consider the offenses committed against Grace, Ryan, and Alex Hopkins (the complainant for the adjudicated California offense and some of the unadjudicated offenses) only if it believed the acts occurred beyond a reasonable doubt. That instruction was not specific to the single adjudicated offense against Alex and therefore also mitigated any effect from the admission of the complaint as to the unadjudicated offenses allegedly committed against him. However, the charge did not include any reasonable-doubt instruction specific to the acts committed against Harry Hopkins or John Foster, the other two complainants in the California complaint, perhaps because, as the record

reveals, Transue did not request any instruction related to the unadjudicated offenses or object to the failure to provide one.[10] *See, e.g., Delgado v. State*, 235 S.W.3d 244, 246, 251 (Tex. Crim. App. 2007) (holding that trial court must include a reasonable-doubt instruction in jury charge when prosecution offers evidence of an extraneous offense at guilt–innocence stage, but only when requested by defendant). Nevertheless, even without the instruction, the record as a whole does not show harm. The charge included an instruction to the jury that the fact that a person has been arrested for or charged with an offense gives rise to no inference of guilt. Given that instruction, the state of the evidence, and the fact that the State did not question any witness about the unadjudicated offenses, did not publish them to the jury, and did not mention them in its opening or closing arguments, we conclude that the admission of the unadjudicated offenses could not have had more than a slight effect on the jury. *See Macedo*, 629 S.W.3d at 240. We overrule the remainder of Transue's first three issues.

### III. Denial of Voluntariness Instruction

In Transue's fourth and final issue, he complains that the trial court erred by denying his requested instruction that he says would have "properly informed the jury of the requirements of voluntariness" under Section 6.01 of the Texas Penal Code.

---

[10]Transue did not request a limiting instruction when the unadjudicated offense evidence was offered and did not request any limiting or burden-of-proof instruction in the jury charge. Transue does not complain on appeal that an instruction should have been included in the charge as to the unadjudicated offenses against Harry Hopkins or John Foster or that he was harmed by its exclusion. *See Delgado*, 235 S.W.3d at 251.

Section 6.01 provides that "[a] person commits an offense only if he [or she] voluntarily engages in conduct, including an act, an omission, or possession." Tex. Penal Code Ann. § 6.01. Transue asserts the evidence that Chloe had, on her own and without Transue's notice, put her mouth on his penis, raised the issue of voluntariness and entitled him to an instruction under Section 6.01.

In response, the State asserts that the voluntariness in Section 6.01 "refers only to one's own physical body movements." The State further argues that Transue was not harmed because, given the evidence and the jury charge—which required the jury to convict Transue only if it found beyond a reasonable doubt that Transue had intentionally or knowingly caused the contact—the jury could not have convicted Transue if it believed that Chloe caused the contact.

For purposes of Section 6.01, a person's bodily movements are not voluntary if they "are the nonvolitional result of someone else's act, are set in motion by some independent non-human force, are caused by a physical reflex or convulsion, or are the product of unconsciousness, hypnosis[,] or other nonvolitional impetus." *Rogers v. State*, 105 S.W.3d 630, 638 (Tex. Crim. App. 2003). Voluntariness in this context "refers only to one's own physical body movements." *Febus v. State*, 542 S.W.3d 568, 574 (Tex. Crim. App. 2018). As the Court of Criminal Appeals explained in *Rogers*,

> "When a person claims the involuntary-act defense[,] he is conceding that his own body made the motion but denies responsibility for it." Sanford H. Kadish, *Excusing Crime*, 75 Cal. L.Rev. 257, 259 (1987). As one commentator observes,

> Professor Kadish's point can be seen if one considers the difference in meaning of the following two sentences: (1) "I raised my arm;" and (2) "My arm came up." Both statements suggest that a bodily movement has occurred. Yet, the difference in language expresses our intuitive understanding of the difference between a voluntary act (as described in the first sentence) and an involuntary one (the second sentence).

Joshua Dressler, Understanding Criminal Law § 9.02[C] at 72 (2d ed. 1995). In the first, the actor consciously performed a volitional act. In the second, the actor performed no conscious or volitional conduct— the arm may have "come up" because someone else moved it; it jerked upward as a reflex reaction when someone hit the elbow; the actor moved his arm while asleep or unconscious; or, more esoterically, the arm moved as a result of hypnotic suggestion or some other non-conscious, non-volitional physical impetus.

105 S.W.3d at 639 n.30; *see also Trujillo v. State*, 227 S.W.3d 164, 169–70 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd) (holding that defendant was not entitled to voluntariness instruction because he did not admit to committing the act charged).

Transue's defensive theory was not that he made some sort of involuntary movement that resulted in his penis's contacting Chloe's mouth, and there was no trial evidence of an involuntary act of that kind. Instead, his argument was that he made no movement at all and that Chloe, on her own, caused her mouth to contact his penis before he knew what was happening. We agree with the State that under the circumstances, Transue was not entitled to a voluntariness instruction. *See Peavey v. State*, 248 S.W.3d 455, 465 (Tex. App.—Austin 2008, pet. ref'd); *Trujillo*, 227 S.W.3d at 170; *see also Rogers,* 105 S.W.3d at 640 (holding that defendant's testimony "did not unambiguously develop the theory that . . . somehow, his finger had been made to

exert the requisite . . . force to squeeze the trigger and fire the gun"). We overrule Transue's fourth issue.

## Conclusion

Having overruled Transue's four issues, we affirm the trial court's judgment.

/s/ Mike Wallach
Mike Wallach
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: August 10, 2023

25